848 P.2d 305

**Joanna CHAPPELL, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Domino's Pizza, Respondent Employer,**

**Industrial Indemnity, Respondent Carrier.**

**No. 1 CA–IC 91–0087.**

Court of Appeals of Arizona, Division 1, Department B.

Sept. 17, 1992.

Review Denied April 13, 1993.

Taylor & Schaar by Thomas R. Stillwell, Phoenix, for petitioner.

Anita R. Valainis, Chief Counsel, Industrial Com'n of Arizona, Phoenix, for respondent.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Donald L. Cross and Christopher Robbins, Phoenix, for respondents.

## OPINION

KLEINSCHMIDT, Judge.

The claimant, Joanna Chappell, injured her wrist while working for Domino's Pizza in 1988. Her claim for compensation benefits was accepted. In 1990, the carrier terminated temporary compensation benefits and awarded the claimant a 10% permanent disability of the upper right extremity. The claimant filed a request for hearing and the administrative law judge agreed with the carrier's position. The decision was affirmed on review, and the claimant filed this special action. We affirm the award.

Shortly after the accident, the petitioner came under the care of Richard C. Christensen, M.D., an orthopedic surgeon who specializes in hand surgery. After an unsuccessful course of conservative treatment, Dr. Christensen performed surgery on the claimant's wrist on two occasions in 1989. In April of 1990, he wrote the carrier, advising that the claimant's condition was stationary with a 10% permanent impairment of the upper right extremity. In May of 1990, the carrier issued the notice of claim status terminating temporary benefits.

The claimant, who was experiencing increased difficulty with her wrist, wanted a second opinion before her case was closed. She was examined twice in June 1990, by Terry Happel, M.D., another hand surgeon. Dr. Happel thought that she might "have a scapholunate dissociation that would be worthwhile to investigate prior to closing her case." He felt that the claimant needed another arthrogram or arthrotomy to evaluate the wrist.

A month later, the claimant was examined by a third hand surgeon, David Zukowski, M.D. Dr. Zukowski testified that it was possible that further intervention would reduce the pain the claimant was experiencing but said that he would defer to the judgment of Dr. Christensen, her attending physician.

In September 1990, the claimant's attorney sent Dr. Christensen a letter summarizing a conversation they had had. He asked Dr. Christensen to sign the letter if the doctor agreed that it correctly set forth the doctor's opinions. The doctor did sign it. Among other things, the letter contained the following:

The issue, in legal terms, that we are litigating is whether Joanna is likely to receive benefit from the further medical care now being offered to her by Dr. Happel. You indicated to me that she may receive benefit from the proposed surgery, and that if Dr. Happel feels comfortable with offering her the procedure, then you would support his going ahead with the procedure.

You also indicated to me that, if Joanna were to ask you for this same procedure, after counseling her regarding the risks and benefits, you would also be willing to offer the procedure to her. At this point, it is your opinion that arthroscopy would be the preferred treatment over arthrotomy, and you indicated that you would appreciate, from an academic standpoint, the opportunity to view a videotape of the procedure, if Dr. Happel proceeds with it.

At the subsequent hearing, Dr. Christensen was asked whether he thought the claimant would benefit from additional surgery or whether it would be best to leave her alone. He answered:

Well, you're asking a real philosophical question and opinion. I think—you know—our Hippocratic oath is to at first do no harm. And I feel now that unless we were to have the dynamic rotatory navicular lunate instability—which I don't feel she has—she's had enough surgery, and I think the treatment is worse than she has right now. That's my feeling.

Now, if she has a dynamic rotatory navicular lunate instability, there's a reasonably good operation for that that doesn't harm her much and doesn't take much away. She has a physical finding, a sign that may be consistent with that. I don't feel her x-rays document it.

Her wrist could be examined under cineradiography to see if there's any shift. Arthroscopy might be able to help one make that diagnosis, but I don't

think I could make that diagnosis even with arthroscopy.

He was also asked whether the open procedure and the arthroscopy he had done gave him enough information to make a determination. He said:

I don't know if that's fair to the patient. Some things we can solve with a knife and some things we can't. There are some doctors that feel more comfortable with some operations than others. I'm just feeling somewhat uncomfortable—I don't think I'd like to operate on her anymore

The following exchange also took place.

Q. Assume that your opinion, your best opinion, is right now that she shouldn't have further surgery. That's your recommendation?

A. Well, if she has dynamic rotatory, which I don't think that she has. I looked at it under arthroscopy. I looked at it even open and I don't think there was any gap there. But if she were to have that, like I say, there is an operation which is—I mean, is not fusing bones and taking away joints, it's just a tenodesis-type surgery and that's a fairly good operation.

Q. I understand that you're trying to be fair to her, but you don't feel you would want to do that operation, true?

A. Well, if I knew that that's what her problem was. I don't think that's her problem.

Q. Correct. So I'm right that right now, as we sit here, you don't want to operate on her?

A. I don't want to operate on her.

Cross-examination by the claimant's attorney proceeded in part as follows:

Q. In terms of the decision whether or not to offer a patient surgery, are we basically here talking about two different doctors assessing the risks versus benefits just a little bit differently?

A. Yes.

Q. And would you agree with me that that's ultimately a patient's decision as to whether or not the risk is sufficient for them to undertake—

A. I think that, first of all, the physician has to think that it can help the patient. So it's certainly the physician's decision, but in the end it's the patient's.

The administrative law judge, in finding that the claimant's condition was stationary, said:

25. To the extent that there is a conflict in medical opinions, the opinion of Dr. Christensen is adopted. Dr. Christensen has the most familiarity with the applicant and her condition. Dr. Christensen stated that the applicant's condition is stationary, and no further active medical treatment is reasonably indicated to improve her condition. *Savage Welding Supply v. Industrial Commission*, 120 Ariz. 592, 587 P.2d 778 (App.1978). The fact that some medical procedure might conceivably or hypothetically benefit an applicant does not mean that her condition is not stationary. *See Savage v. Industrial Commission, Supra.* Additional treatment would not benefit the applicant and her condition is stationary. Applicant could have been discharged with permanent disability equal to 10% loss of use of the right major extremity.

The petitioner contends that the administrative law judge erred in accepting Dr. Christensen's "equivocal and self-contradictory" evidence. She also asserts, citing *Johnson–Manley Lumber v. Industrial Comm'n*, 159 Ariz. 10, 764 P.2d 745 (App. 1988), that the workers' compensation statutes should be construed liberally so that the worker receives every chance at a complete recovery.

■ We agree that a claimant should have every reasonable chance to recover and we readily accept the proposition, also propounded in *Johnson–Manley Lumber*, that it may well be reasonable to require a carrier to pay for a surgical procedure even though the goals of the procedure are limited and there is no guarantee that it will succeed. It remains, however, for the administrative law judge to determine whether the procedure sought is reasonably required under all the circumstances of the case. *Regnier v. Industrial Comm'n*, 146 Ariz. 535, 707 P.2d 333 (1985).

■ The administrative law judge did not abuse his discretion by accepting Dr. Christensen's opinion of whether additional

surgery would be beneficial to the claimant. We view what the petitioner characterizes as equivocation by Dr. Christensen more as an evolution of his opinion and as a tacit acknowledgement that the question of whether to proceed with surgery is a close one. We therefore affirm the award.

The matter need not end with our disposition of this special action. If the claimant still wants to attempt to improve her condition by undergoing surgery, she is, of course, free to do so and may yet have some recourse for recovering the cost of that treatment. A leading authority in the field notes:

> In this connection, difficult questions can arise when ... the employer's doctor recommends conservative measures while the claimant thinks he should have surgery. One way to settle this kind of controversy is to let the result turn on whose diagnosis proved right.

2 Arthur Larson, *The Law of Workmen's Compensation,* § 61.12(e) at 10–887 (1992). Larson proceeds to discuss a number of cases which hold that a claimant in these circumstances is entitled to reimbursement for self-procured treatment if the diagnosis proves correct and the treatment effective. As a corollary to this, if the treatment is ineffective, its cost, as well as any added ill which may result from it, must be borne by the claimant.

The approach Larson describes is consistent with Arizona law. In *Baudanza v. Industrial Comm'n,* 149 Ariz. 509, 720 P.2d 110 (1986), the claimant suffered a back injury on the job and underwent a laminectomy. His condition improved and then worsened. The surgeon who had performed the laminectomy recommended against further surgery but the defendant's treating physician procured another opinion from a surgeon who recommended additional surgery. The additional surgery was done, and the employer's carrier refused to pay for it, claiming that it had not been notified in advance that the surgery would proceed. The claimant brought a proceeding under Ariz.Rev.Stat.Ann. ("A.R.S.") § 23–1061(J) to force the carrier to pay. The administrative law judge dismissed the proceeding because the claimant had not secured the carrier's permission for the surgery. We said that prior *approval*

by the carrier was unnecessary as long as notice was given that the claimant intended to proceed with surgery, and in doing so, we cited section 61.12(e) of Larson, concluding:

> Of course, a claimant who proceeds with treatment without the permission of the carrier or without a ruling from the Industrial Commission that the treatment is compensable does so at his own risk. If the treatment is ultimately found not to be reasonably required, it will not be compensable. *See Shockey v. Industrial Comm'n,* 140 Ariz. 113, 118, 680 P.2d 823, 828 (App.1983).

149 Ariz. at 513, 720 P.2d at 114.

If the petitioner wishes to pursue this course, she should file a petition to reopen before undergoing surgery. *See* A.R.S. § 23–1061(H).

The award is affirmed.

JACOBSON, P.J., and GARBARINO, J., concur.